Mark E. **BAISCH**, Plaintiff–Appellant,

v.

Frank G. **GALLINA**, McKinnon–Doxsee Insurance Agency, Inc., Peter G. Rubino, Jr., Peter G. Rubino, Sr., and John Does 1–25, Defendants–Appellees.

Docket No. 02–9047.

United States Court of Appeals, Second Circuit.

Argued March 6, 2003.

Decided Oct. 2, 2003.

---

Joseph F. Donley, Swidler Berlin Shereff Friedman, LLP, (Robert W. Topp, on the brief) New York, NY, for Appellant.

Stephen C. Cunningham, Lustig & Brown, (Benjamin J. Stone, on the brief) New York, NY, for Appellees Gallina and McKinnon–Doxsee Insurance Agency, Inc.

Edward M. Gould, Islip, NY, for Appellees the Rubinos.

Before: WALKER, Chief Judge, JACOBS and CALABRESI, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

Plaintiff-appellant Mark Baisch appeals from the judgment of the United States District Court for the Eastern District of New York (William D. Wall, *Magistrate Judge*), (1) granting the motion for summary judgment by defendants-appellees Frank Gallina and McKinnon–Doxsee Insurance Agency, Inc., on the grounds that Baisch did not have standing under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, to bring his claims against any of the defendants, and (2) declining to exercise its supplemental jurisdiction over Baisch's state law claims.

## I. BACKGROUND

### A. The Racketeering Scheme

Baisch is in the business of providing construction services, including extending financing to other construction firms. The Rubinos are father and son contractors who operated Raycon Construction Company. Gallina is a shareholder, broker, and vice-president of McKinnon–Doxsee Insurance Agency, which provides or brokers insurance. Gallina and Rubino, Jr. were friends who were in regular contact. Because we are reviewing the district court's grant of summary judgment against Baisch, the following facts are presented in a light most favorable to Baisch.

According to Baisch, the defendants defrauded him, as well as Nassau County and unnamed insurance companies, by falsifying construction documents, payroll forms, and other documents. Starting in 1990, Nassau County hired Raycon for various construction projects. One of the terms of their contract was that the workers on the projects could not be independent contractors, but had to be employed by Raycon. The contract also required Raycon to post performance bonds and to provide the County periodically with proof of workers' compensation, disability, and general public liability insurance. Raycon had to provide the County with estimates of the number and type of workers needed for each project, along with the number of hours to be worked and the hourly rate per worker. Baisch claims that the defendants engaged in a pattern of racketeering activity by causing Raycon to submit to Nassau County fraudulent documents, including inflated estimates and falsified claim vouchers. Baisch alleges that by 1990 Gallina and McKinnon–Doxsee, who were providing insurance brokerage services to Raycon, knew that the Rubinos were engaged in racketeering activity. Gallina and McKinnon–Doxsee helped the Rubinos and Raycon obtain the insurance policies and performance bonds to enable them to continue their racketeering activities, provided them with false certificates of insurance, and fraudulently obtained replacement policies when Raycon's policies were cancelled for nonpayment. Gallina and McKinnon–Doxsee also prepared false information to be used by the workers' compensation and disability insurance carriers in their payroll audits of Raycon in order to reduce Raycon's premiums.

In April 1994, Baisch alleges that Gallina asked him if he would provide a commercial loan to Raycon and the Rubinos, whom

Gallina represented as reliable and credit-worthy. Baisch claims that he relied on Gallina's representations when he made his first loan to the Rubinos that year and thereafter continued lending them money until July 1996. The Rubinos allegedly used those funds to support their fraudulent activity.

In February 1997, after Baisch had checked Raycon's credit, Baisch and Rubino, Jr. entered into a factoring agreement, under which Baisch would loan money to Raycon approximately equal to the amount of Raycon's claim vouchers submitted to Nassau County. Then Baisch would collect on each loan when Nassau County paid Raycon for its claimed work. Baisch alleges that Gallina urged him to enter the factoring agreement and reiterated earlier misrepresentations of Raycon's and the Rubinos' financial reliability. Gallina conceded that he arranged for the 1994 loan from Baisch to Raycon so that he could "procure the necessary bond for Raycon, because Raycon lacked the funds needed for collateral."

Baisch argues that the Rubinos used the 1997 factoring agreement "to continue the racketeering activities." Under the factoring agreement, the Rubinos submitted forty-four vouchers to Baisch between February 1997 and May 1999, upon which Baisch advanced to Raycon more than $850,000. Baisch alleges that the vouchers were fraudulent and that some of the vouchers were never even submitted to Nassau County, leading Baisch to provide loans that, under the terms of the factoring agreement, could not be repaid. The Rubinos failed to repay ten loans from Baisch and only partially repaid four more, leaving $306,000 unpaid. In August 1999, at a meeting with Baisch and Baisch's attorney, Rubino, Jr. admitted to Baisch that he had submitted false invoices to him in order to obtain the needed loans. Rubino, Jr. later

that month signed a confession of judgment in favor of Baisch in the amount of $357,440.21.

Supporting his allegation that Gallina and McKinnon–Doxsee knew of Rubino's fraudulent activities, and hence were racketeering co-conspirators, Baisch offers statements by Gallina from a videotape surreptitiously recorded in March 2000, about a year after the Rubinos began defaulting on his loans and several months after the authorities started investigating Raycon's fraud schemes. Gallina does not deny that he made these statements. Rather, Gallina argues that his later depositions, in which he denied knowledge of the fraud, are more credible than the recordings. He also does not argue that the videotape should be inadmissible in this civil proceeding.

In the videotape, Gallina states:

You know the situation over there and the time sheets that [Rubino] was submitting with phony names on it. He was getting them signed off when he didn't have any people there ... [Rubino has been engaged in these practices for] [t]en ... years at least that I know of ... [I]t's been going on forever. He was paying off everybody that he could.

. . . .

See, I thought it was a matter of okay, he gets these phony time sheets. Guys sign off on it. He pays these guys a few bucks for signing off on it. But it must have gone a lot deeper than that for the FBI to come in.

As further evidence of Gallina's knowledge, Baisch offers McKinnon–Doxsee's records of Raycon's ten cancelled insurance policies from 1994 to 1997 and internal McKinnon–Doxsee memos referring to Rubino's "terrible [payment] history back to 1996." Baisch also refers to Gallina's recorded statements on the videotape stating that he provided insurance certificates

to Nassau County when he knew that Raycon did not have insurance, and to Gallina's awareness that Raycon's insurers repeatedly cancelled Raycon's insurance. Nevertheless, Gallina continued to seek insurance for Raycon and falsely stated on Raycon's insurance applications in 1994 and 1998 that Raycon's insurance had not been cancelled.

In June 2001, Rubino, Jr. filed a bankruptcy petition in the United States Bankruptcy Court for the Eastern District of New York, and in October 2001, a discharge was granted. Also in October 2001, Rubino, Jr. was arrested and charged with defrauding Nassau County.

## B. The District Court Decision

Baisch commenced this action in August 2000. His amended complaint alleges violations of § 1962(c) and (d) of RICO, as well as violations of state common law. Gallina and McKinnon–Doxsee moved for summary judgment. The motion was heard by a magistrate judge sitting as the district court upon the consent of parties, 28 U.S.C. § 636(c), and the district court determined that Baisch lacked statutory standing to bring his claims against the defendants under RICO. *Baisch v. Gallina,* Civ. 00–5019, at 8–11 (E.D.N.Y. August 8, 2002). The district court applied the "zone-of-interests" test to determine whether "apart from the directness of the injury, the plaintiff is within the class of persons sought to be benefitted by the provision at issue." *Id.* at 9 (quoting *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 287–88, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (Scalia, J., concurring)).

The district court concluded that "the factoring agreement and the relationship between Baisch, [the Rubinos], and Gallina was too distinct from the overall County scheme to be part of it for the purpose of RICO liability" and that "[t]here is no evidence to suggest that the intent of *the enterprise*—as opposed to the factoring agreement—was to defraud Baisch." *Id.* at 10. Relying on its reading of our decision in *Abrahams v. Young & Rubicam Inc.,* 79 F.3d 234 (2d Cir.1996), the district court concluded that Baisch lacked standing on two independent grounds. First, in order for a plaintiff to have standing in RICO's zone of interests, he must be "the target of the racketeering enterprise." *Id.* (quoting *Abrahams,* 79 F.3d at 238). The district court concluded that Nassau County, not Baisch, was the target of the racketeering enterprise. Second, the plaintiff's injury must "flow from the harms that the predicate acts ... were intended to cause and the laws against them were intended to prevent." *Id.* (quoting *Abrahams,* 79 F.3d at 238). The district court found that "Baisch's injury was the result of [the Rubinos'] failure to repay him, not the result of the alleged RICO enterprise or its predicate acts." *Id.* at 10–11. The district court characterized Baisch's claims as a "creative effort[ ] to stretch" common law fraud into a RICO claim. *Id.* at 11. The district court declined to exercise its supplemental jurisdiction over Baisch's state law claims, and also found an independent ground for dismissing the claims against Rubino, Jr. because the bankruptcy court for the Eastern District of New York had discharged Rubino, Jr.'s debts. *Id.* at 11. Baisch has appealed from the district court's grant of summary judgment to the defendants.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate only if there is no genuine issue as to any material fact, Fed.R.Civ.P. 56(c), and the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,*

477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When ruling on a summary judgment motion, a court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. RICO Standing and the "Zone–of–Interests" Test

Baisch argues on appeal that he does have standing to assert his RICO claims against the defendants. Section 1962(c) of RICO provides that it is "unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce[ ] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...." Section 1962(d) provides that it is "unlawful for any person to conspire to violate" subsection (c). Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 ... shall recover threefold the damages he sustains."

The Supreme Court has advised that "RICO is to be read broadly. This is the lesson not only of Congress's self-consciously expansive language and overall approach, but also of its express admonition that RICO is to be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (citations and quotation marks omitted).

We recently clarified our approach to RICO standing in *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120–24 (2d Cir.2003). We need not repeat *Lerner's* thorough analysis, but we will review its main points. To demonstrate standing, a plaintiff must plead, at a minimum, "(1) the defendant's violation of [§ ]1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation. This third requirement is satisfied if the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged." *Id.* at 120 (internal quotation marks and citations omitted). The *Lerner* court then turned to the question of whether to apply separately the "statutory standing" or zone-of-interests test, "which seeks to determine whether, apart from the directness of the injury, the plaintiff is within the class of persons sought to be benefitted by the provision at issue." *Holmes*, 503 U.S. at 287, 112 S.Ct. 1311 (Scalia, J., concurring). In 1992, the Supreme Court majority could have addressed this issue in *Holmes*, but thought it was "inopportune to resolve the issue" at that time, and instead resolved the standing question solely on proximate causation grounds. *Id.* at 276, 112 S.Ct. 1311. In his concurrence, Justice Scalia argued that a plaintiff has standing under RICO only if he or she fulfills the traditional elements of statutory standing of the predicate statutes on which the RICO claim is based. *Holmes*, 503 U.S. at 288–89, 112 S.Ct. 1311 (Scalia, J., concurring). Two of those requirements are proximate causation and the zone-of-interests test. *Id.* Justice O'Connor, joined by Justices White and Stevens, rejected Justice Scalia's approach, concluding that RICO does not incorporate the standing requirements of the predicate acts. *Id.* at 280, 112 S.Ct. 1311 (O'Connor, J., concurring). We followed *Holmes* by resolving the standing issue on proximate cause grounds in *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 188 (2d Cir.1995), and later we noted that "it is unclear precisely how this test would apply under the com-

plex structure of the RICO statute." *Lerner*, 318 F.3d at 120. In *Lerner*, we concluded that "if the standing issue may be resolved on proximate cause grounds, the question whether the plaintiff must also satisfy the standing requirements of the underlying statutes whose violations constitute the predicate acts ... need not be reached." *Id.* at 122, 318 F.3d 113.

Nevertheless, we have incorporated the language of the zone-of-interests test into our analysis of RICO standing. In *Abrahams*, we held that a RICO plaintiff must show "both that he is within the class the statute sought to protect and that the harm done was one that the statute was meant to prevent." 79 F.3d at 237 & n. 3. In *Lerner*, we noted that *Abrahams*:

> used the language of zone-of-interests, rather than proximate cause, to discuss standing requirements under the RICO statute. Yet in so doing, we were not importing an additional standing requirement; we merely sought to apply the same standing test endorsed by the *Holmes* Court under a more precise terminology. Our fear was that use of the proximate cause language in discussions of statutory standing could lead to confusion with its common-law counterpart. As *Abrahams* recognized, however, RICO proximate causation is a distinct concept—one that sometimes overlaps with zone-of-interests analysis. Both of these statutory standing principles are grounded on similar policy considerations, imposing limitations on the types of injuries that are sufficiently related to core RICO concerns as to be cognizable. Thus, the reasonably foreseeable victim of a RICO enterprise will often be, unsurprisingly, the type of victim the RICO statute seeks to protect.

318 F.3d at 121 n. 6. Thus, statutory standing is included in our proximate cause analysis. Two other circuits have applied the zone-of-interests test independently from the proximate cause analysis. *See Newton v. Tyson Foods, Inc.*, 207 F.3d 444, 447 (8th Cir.2000); *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1258 (7th Cir.1995). We have no quarrel with that approach, but because our RICO proximate cause analysis adequately incorporates the zone-of-interests test's concerns in most cases, we have never applied that test independently from our RICO proximate cause analysis. We now clarify that it is inappropriate to apply a zone-of-interests test independent of this circuit's proximate cause analysis.

## C. Proximate Cause

■ *Lerner*'s two-part test for proximate causation is as follows. First, the plaintiff's injury must have been "proximately caused by a pattern of racketeering activity violating [18 U.S.C. § ]1962 or by individual RICO predicate acts." 318 F.3d at 122–23 (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990)). In other words, a plaintiff does not have standing if he suffered an injury that was indirectly (and hence not proximately) caused by the racketeering activity or RICO predicate acts, even though the injury was proximately caused by some non-RICO violations committed by the defendants. In *Lerner*, the plaintiff's injuries were proximately caused not by the racketeering activity itself, but by the defendant's violation of state reporting requirements, which were not RICO predicate acts under § 1961(1). Thus the plaintiffs lacked standing. *Id.* at 123.

■ Second, the plaintiff must have suffered a direct injury that was foreseeable: "Central to the notion of proximate cause [under RICO] is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those

with respect to whom his acts were 'a substantial factor in the sequence of responsible causation,' and whose injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Lerner*, 318 F.3d at 123 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994)). As an elaboration of this second prong relating to the directness of the injury, *Lerner* noted that "the reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise." *Id.* at 124. As the *Holmes* Court explained in its opening discussion of proximate cause and direct injury, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." 503 U.S. at 268–69, 112 S.Ct. 1311.

■ Applying Lerner's first part of the test, we find that Baisch's injury was directly caused by the Rubinos' fraudulent factoring agreement. To determine if Baisch has RICO standing, we first ask if Baisch's injury was proximately caused by a pattern of racketeering activity violating § 1962 or by individual RICO predicate acts. Mail fraud under 18 U.S.C. § 1341 is listed as "racketeering activity" in RICO, 18 U.S.C. § 1961(1)(B), and Baisch has sufficiently alleged that the defendants' racketeering pattern of mail fraud proximately caused his injury.

The district court, however, "decline[d] to accept th[e] connection" between the factoring agreement and the RICO fraud against the County and viewed it as "too distinct from the overall ... scheme." We fail to see how the district court could reach this conclusion. The mail frauds against Baisch through the factoring agreement directly promoted the fraud against Nassau County, and the fraud against Nassau County was the basis for the fraud against Baisch that led to his injury. The frauds against Baisch and those against Nassau County were not just linked; they were intertwined as coordinated parts of one racketeering enterprise, and they formed a "pattern" of racketeering. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Gallina argues that Baisch has not linked Gallina's conduct to any mail fraud, but Baisch has in fact presented a genuine question as to Gallina's commission of mail fraud that proximately caused Baisch's injuries. Even if Gallina never mailed a fraudulent letter himself, Baisch has sufficiently alleged that Gallina committed mail fraud by "act[ing] with knowledge that the use of the mails will follow in the ordinary course of business," and that the use of mail could have been "reasonably foreseen." *United States v. Tocco*, 135 F.3d 116, 124 (2d Cir.1998) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954)).

■ The second part of *Lerner*'s test for analyzing proximate cause asks whether the defendants' acts were "a substantial factor in the sequence of responsible causation," and whether the plaintiff's injury was "reasonably foreseeable or anticipated as a natural consequence." *Lerner*, 318 F.3d at 123. The district court seemed to reason that Baisch did not have standing because another party—Nassau County—sustained an injury more directly from the racketeering enterprise. However, RICO standing extends to all directly injured parties, not just the most directly injured among them. The frauds by the defendants plainly injured Baisch directly.

Moreover, reasonable foreseeability under *Lerner* was established because Baisch was a "target[ ]" and "intended victim[ ]" of the racketeering enterprise." *Lerner*, 318 F.3d at 124; *see also Abrahams*, 79 F.3d

at 238. The district court concluded that "Baisch was not the target of the alleged racketeering enterprise, which was directed at defrauding Nassau County," implying that only a single target of a racketeering enterprise has standing. *Baisch,* Civ. 00–5019, at 10. No precedent suggests that a racketeering enterprise may have only one "target," or that only a primary target has standing. *Lerner's* expanded list of "target, competitors, or intended victims" clarifies that there is a broad class of plaintiffs under RICO. The defendants specifically targeted Baisch as their victim allegedly by taking his loans under false pretenses and consciously creating a high risk of defaulting on those loans. We have recognized standing in cases where the plaintiff was a less obvious target or intended victim, and where his or her injuries were arguably less direct. *See, e.g., Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc.,* 271 F.3d 374, 380 (2d Cir.2001) (reversing dismissal of RICO claim on standing grounds where plaintiff was injured by competitor's illegal hiring of aliens, thus permitting defendant to underbid plaintiff); *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 171–73 (2d Cir.1999) (plaintiff investor allowed to bring RICO claims against financial services company that fraudulently marketed its insurance product as an investment product); *GICC Capital Corp. v. Tech. Fin. Group,* 30 F.3d 289, 292–93 (2d Cir.1994) (creditor of corporation had RICO standing to sue defendants who stripped assets by predicate act of looting).

## D. The "Intended Harm" Requirement

■ Nothing in the above discussion is in any way inconsistent with our holding in *Abrahams,* which incorporated the zone-of-interests test into the aforementioned proximate cause analysis by requiring that a RICO plaintiff "must show both that he is within the class the statute sought to protect and that the harm done was the one that the statute meant to prevent." *Abrahams,* 79 F.3d at 237. The Supreme Court has interpreted RICO expansively, "primarily [because] of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of 'pattern.'" *H.J. Inc.,* 492 U.S. at 236, 109 S.Ct. 2893 (internal quotation marks omitted). And, RICO was designed, in part, to protect investors and lenders from losing money to elaborate mail fraud schemes. Given all this, it is plain that Baisch's allegations are sufficient to establish standing.

In holding that the plaintiff in *Abrahams* was not a "target" of the enterprise and thus did not have standing, we explained that his "injuries did not flow from the harms that the predicate acts ... were intended to cause and the laws against them were intended to prevent." *Abrahams,* 79 F.3d at 238. And that was true enough on the facts in *Abrahams.* In the instant case, however, the district court, in relying on this language to conclude that Baisch lacked standing, read "intended harm" too restrictively. In the facts of this case, we look at the intent to create *a risk of harm. Abrahams* cited William Prosser, et al., *Prosser and Keeton on the Law of Torts,* § 36, at 224–25, but nowhere do those cited pages support a requirement that the defendant intend the specific harm, only that the statute must be intended to protect a particular class of persons and to prevent a particular class of risks. Nor can we find any decision in any other circuit read "intended harm" so narrowly.[1]

---

1. The defendants also cite *In re Am. Express Co. S'holder Litig.,* 39 F.3d 395, 399 (2d Cir. 1994), as establishing a rule that a plaintiff has RICO standing only if the injury was the

■ Moreover, in several paradigmatic racketeering enterprises, the racketeer does not necessarily intend to harm the specific victim. He or she may, instead, intend no more than to create a substantial risk of injury to the victim. In a Ponzi scheme, for example, the racketeer targets investors through fraud, but he does not consciously intend for those investors to lose their money; he simply wants to perpetuate the Ponzi scheme for as long as possible. Similarly, in a case where a racketeer collects loans under false pretenses, he may intend to repay the loan so that no one suffers an injury, but he has fraudulently created a high risk of default, and the plaintiff may be injured as a result of that risk. Where a racketeering enterprise intends no specific harms to any particular individual, but causes harm by the creation of substantial risk of harm, the victim injured by that enterprise's harm may have RICO standing under *Abrahams*.

### E. Baisch's Standing Against Gallina

Gallina also argues that he is not a proper defendant for Baisch's RICO claim because 1) he committed no predicate criminal acts; 2) he did not operate or manage the enterprise; and 3) even if Baisch has presented an issue of Gallina's knowledge of fraud, such knowledge is insufficient to establish RICO conspiracy. We addressed Gallina's first argument *supra,* and found that Baisch has presented a genuine question as to Gallina's committing mail fraud and causing Baisch's injury.

■ Baisch has also adequately alleged that Gallina participated in the operation or management of the enterprise. To be liable under 18 U.S.C. § 1962(c), which prohibits participation in a racketeering enterprise, "one must have some part in directing [the enterprise's] affairs.... RICO liability is not limited to those with primary responsibility for the enterprise's affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). One is liable under RICO if he or she has "discretionary authority in carrying out the instructions of the [conspiracy's] principals," *United States v. Diaz,* 176 F.3d 52, 93 (2d Cir. 1999), or "played some part in directing the affairs" of the RICO enterprise, *DeFalco v. Bernas,* 244 F.3d 286, 311 (2d Cir.2001); *see also United States v. Miller,* 116 F.3d 641, 673 (2d Cir.1997); *Napoli v. United States,* 45 F.3d 680, 681–83 (2d Cir.1995).

■ Gallina demonstrated his discretionary authority and direction of the enterprise by recruiting financing for the enterprise, obtaining bonds and insurance coverage, issuing false insurance certificates, concealing Raycon's deceptive payroll practices, and representing the Rubinos in meetings with Baisch. Therefore, Baisch has standing to bring his RICO claims against Gallina under § 1962(c). We also note that the requirements for RICO's conspiracy charges under § 1962(d) are less demanding: A "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of

"preconceived purpose" or the "specifically intended consequence" of the enterprise. However, in *American Express* we were simply quoting these phrases from the plaintiffs' brief, which argued that the defendants had specifically intended the injuries. We rejected those claims on their own terms, but we did not generalize from the plaintiffs argument that RICO plaintiffs were required to demonstrate that the injury was the "preconceived purpose." *American Express* held that an injury must be the foreseeable result—not necessarily the intended result—of the racketeering enterprise. 39 F.3d at 400.

furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). In the civil context, a plaintiff must allege that the defendant "knew about and agreed to facilitate the scheme." *Id.* at 66, 118 S.Ct. 469. Baisch has presented a genuine question as to Gallina's knowledge of the racketeering enterprise and his willingness to promote it. The defendants have offered no reason why Baisch has not presented a material question as to McKinnon–Doxsee's liability, considering that Gallina is a director and vice-president, and that Gallina acted in those official capacities in committing these frauds.

Baisch, however, has not contested the district court's dismissal of the federal claims against Peter Rubino, Jr. on the ground that his debts had been discharged by the bankruptcy court. Thus, we affirm the district court's dismissal of Baisch's claims against Rubino, Jr.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the dismissal of claims against Rubino, Jr., and we VACATE the district court's grant of summary judgment for the other defendants and REMAND for further proceedings consistent with this opinion.