**Rose VALENTI, et al., Plaintiffs,**

v.

**The PENN MUTUAL LIFE INSURANCE CO., et al., Defendants.**

**No. 10 Civ. 3325 JGK.**

United States District Court, S.D. New York.

March 28, 2012.

Jill Rosell, Jill Rosell, PLLC, New York, NY, for Plaintiff.

Steven E. Mellen, Winget, Spadafora & Schwartzberg, LLP, Judith Ann Lockhart, Gerald William Griffin, Leonardo Trivigno, Carter Ledyard & Milburn LLP, New York, NY, for Defendant.

## OPINION AND ORDER

JOHN G. KOELTL, District Judge:

This case involves an alleged conspiracy by the defendants to embezzle funds from the plaintiffs' ERISA pension plan (the "Plan"), in violation of 18 U.S.C. §§ 1964 and 664. The plaintiffs are Valenti, Ltd. (the "Company"), a cosmetics and fragrance concern, Rose Valenti, the president and founder of the Company and a Trustee of the Plan, Donald Valenti, her husband and a Plan Trustee, and various individual Plan participants (collectively, the "plaintiffs"). The defendants are Penn Mutual Life Insurance Company ("Penn Mutual") and its agent, Victor Mauro, and the Penn Pension Center ("Penn Pension"), and its president, Andrew Siegel (collectively, the "defendants"). Jurisdiction is proper pursuant to 28 U.S.C. § 1332 and 18 U.S.C. § 1964(c). The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons explained below, the motion for summary judgment is **granted**.

## I.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate if it appears that the nonmoving party cannot prove an element that is essential to the nonmoving party's case and on which it will bear the burden of proof at trial. *See Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir. 2004). In determining whether summary judgment is appropriate, a court must re-

solve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir.1998); *Montalbano v. Port Authority of New York and New Jersey,* 843 F.Supp.2d 473, 477, No. 10 Civ. 5973, 2012 WL 516150, at *1 (S.D.N.Y. Feb. 17, 2012).

## II.

The following facts are undisputed unless otherwise noted:

Rose Valenti founded the Company in 1983. (Second Amended Complaint ("SAC"), at ¶ 10.) The Plan, a defined-benefit retirement plan covering all Company employees with two or more years of Company service, was established in 1988. (Def.'s R. 56.1 Stmt. at ¶ 4; Pl.'s R. 56.1 Stmt. at ¶ 4; *see also* Siegel Aff. Ex. 1 ("Amended Plan"), at PP 5187, PP 5189.) Rose Valenti and her husband Donald were the Trustees of the Plan. (Amended Plan at PP 5188.) The Plan's initial assets included a whole life insurance policy for

Donald Valenti. (Def.'s R. 56.1 Stmt. at ¶ 9; Pl.'s R. 56.1 Resp. at ¶ 9.)

In 1994, the Valentis hired Penn Pension as a third-party administrator for the Plan. (*See* Def.'s R. 56.1 Stmt. at ¶ 6; Pl.'s R. 56.1 Resp. at ¶ 6; *see also* Siegel Aff. ¶ 4.) Penn Pension thereafter prepared the Plan's IRS Form 5500 tax returns for each fiscal year, and these prepared forms were provided to Rose Valenti. (*See* Siegel Aff. ¶ 4; *see also* Def.'s R. 56.1 Stmt. at ¶ 7; Pl.'s R. 56.1 Resp. at ¶ 7.) The contemporaneous Form 5500s and their supporting documents, including actuarial reports for each of the Plan years at issue, are in the discovery record in this case. (*See, e.g.,* Siegel Aff. ¶¶ 11–58 & Exs. 3–12 (Form 5500s for tax years 1998 through 2008); *see also* Siegel Aff. Exs. 23–33 (Actuarial Reports for Plan Years 1998 through 2009).)

Also in 1994, the Plan purchased a Diversifier I Flex group annuity contract (the "Diversifier I") from Penn Mutual. (*See* Def.'s R. 56.1 Stmt. at ¶ 10; Pl.'s R. 56.1 Resp. at ¶ 10.) Thereafter, other assets were added to the Plan, in particular several other life insurance policies on the lives of the Valentis. (*See* Siegel Aff. ¶ 5; *accord* Pl.'s R. 56.1 Resp. at ¶ 15; *see also* Siegel Aff. Exs. 13–17, 19–22 (insurance policies, forms adding those policies to the Plan, annual statements on the policies).) The plaintiffs also assert that another annuity, the Diversifier II, which was issued to Rose Valenti in 1999, was an asset of the Plan. (*See* Pl.'s R. 56.1 Resp. at ¶¶ 10, 15.) With regard to the Diversifier I, Penn Mutual generated annual statements after the end of each fiscal year for the Diversifier I's performance, and sent these statements to Donald Valenti. (*See* Locker Aff. ¶ 4; *see also* Locker Aff. Ex. A (Diversifier I annual statements).) Penn Mutual retained original, contemporaneous copies of these annual statements and pro-duced them during discovery in this litigation. (*See* Locker Aff. ¶¶ 3–4.)

The plaintiffs have conceded that the paper records produced in discovery regarding the Plan's accounts and the Diversifier I do not provide any evidence of embezzlement. (*See* Oral Arg. Tr. at 20 ("THE COURT: [I]f you accept, just for the present purpose, the paper records of the accounts, they all add up to the penny, including the withdrawals, the deposits, the beginning balances, the ending deposits, right? MS. ROSELL: Yes, these statements do, yes.").) However, the plaintiffs argue that the original paper records for the Diversifier I that were produced are not credible, and that Penn Mutual has falsely asserted that it is unable to produce for discovery the underlying original electronic records for the Diversifier I. (*See* Pl.'s R. 56.1 Resp. at ¶¶ 17, 20.) More broadly, the plaintiffs assert that values of the Plan that were reported by Penn Pension on the Form 5500 tax forms, and in other paper records, were falsified in order to conceal embezzlement from the Plan. (*See, e.g.,* Pl.'s R. 56.1 at ¶¶ 46, 94.)

On July 28, 2008, the Valentis each sent letters to Penn Mutual requesting that their portions of the Plan be transferred to their accounts with Washington Mutual ("WAMU"). (*See* Siegel Aff. Exs. 47–48.) In a letter recounting the Valentis attempts to close their accounts, Mauro stated that he told WAMU that the Valentis' portions of the Plan could not be transferred to WAMU until the Plan was successfully terminated "because, as owners and sponsors of the Plan, monies must first go to satisfy the vested interest of their employees." (Seigel Aff. Ex. 49 (Letter dated June 15, 2009 of Victor Mauro ("Mauro Letter")), at 1; *see also* Siegel Aff. ¶ 59.) There is no evidence in the record indicating that the Valentis authorized the termination of the Plan before

September 2008, when the stock market dropped precipitously. The evidence in the record shows that the Diversifier I lost significant value during that period, (*see* Locker Aff. Ex. A at PM 00067), however, the plaintiffs assert that the Plan "did not incur losses as a result of the stock market crash" but rather "incurred losses as a result of defendants' embezzlement." (Pl.'s R. 56.1 Resp. ¶ 97; *see also* Pl.'s R. 56.1 Resp. ¶¶ 23–24.)

Rose Valenti and Andrew Siegel of Penn Pension exchanged correspondences concerning the termination of the plan beginning in October, 2008. (*See* Siegel Aff. ¶¶ 59–64 & Exs. 50–60.) Valenti accused Penn Pension of not promptly transferring her portion of the Plan to WAMU, and asserted that Penn Pension was responsible for the Plan's lost value. (Siegel Aff. Ex. 51.) Siegel replied that Penn Pension was the third-party administrator of the Plan and had nothing to do with the investment or processing of the assets of the Plan, and repeated that funds could not be transferred until the Plan was properly terminated. (Siegel Aff. Ex. 52.) The record indicates that Penn Pension was still receiving releases from the Plan participants as late as June, 2009. (*See, e.g.,* Siegel Aff. Ex. 56 at PP 3722; *see generally* Siegel Aff. ¶ 63.) The Plan made its final distribution in September, 2009. (*See* Siegel Aff. Ex. 59 at PP 3558.)

The plaintiffs assert that the termination discussions actually began in January, 2008, and the discovery record confirms that there was a meeting between Seigel, Mauro, and Rose Valenti in January, 2008. (*See* Pl.'s R. 56.1 Resp. ¶ 98; Rosell Decl. Ex. 64.) More broadly, the plaintiffs assert that the defendants intentionally delayed in terminating the account so that they could take advantage of losses in the stock market to mask their embezzlement

from the Plan. (*See, e.g.,* Pl.'s R. 56.1 Resp. at ¶ 103.)

The plaintiffs filed this lawsuit in April, 2010. The Second Amended Complaint was filed in August, 2010. This Court denied the defendants' motion to dismiss the Second Amended Complaint in May, 2011. Discovery in this case is now closed. The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that there is no evidence of embezzlement in this case.

## III.

### A.

The plaintiffs have asserted a single cause of action in this case. They allege a conspiracy by the defendants to violate 18 U.S.C. § 1962(c) through a scheme to embezzle from the Plan.

■■■ To establish a civil RICO claim pursuant to § 1962(c), "a plaintiff must establish: '(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly . . . participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce.'" *Weizmann Institute of Science v. Neschis,* 229 F.Supp.2d 234, 254–55 (S.D.N.Y.2002) (quoting *Moss v. Morgan Stanley,* 719 F.2d 5, 17 (2d Cir. 1983)); *see generally* 18 U.S.C. § 1962(c). A plaintiff must also establish "causation," by establishing that a defendants' violation of § 1962 caused an injury to the plaintiff. *Id.*

■■■ To establish a RICO conspiracy claim pursuant to § 1962(d) a plaintiff must establish " 'as to each alleged coconspirator: (1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy; (3) that the co-conspirator knowingly partici-

pated in the same.' " *Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.,* 165 F.Supp.2d 514, 541 (S.D.N.Y.2001) (quoting *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 303 (S.D.N.Y.2000)). The Court of Appeals for the Second Circuit has explained that, in a civil RICO conspiracy case, the plaintiff must establish that each defendant "knew about and agreed to facilitate" a pattern of racketeering activity. *Baisch v. Gallina,* 346 F.3d 366, 377 (2d Cir.2003).

■ Racketeering activity for the purpose of a civil RICO claim includes violations of 18 U.S.C. § 664. *See* 18 U.S.C. § 1961(1). Under § 664, it is unlawful for any person to "embezzle[ ], steal[ ], or unlawfully and willfully abstract[ ] or convert[ ] to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith . . . ." 18 U.S.C. § 664. Embezzling from an ERISA plan thus constitutes racketeering, and is a predicate act upon which a civil RICO claim may be based. *See, e.g., Toms v. Pizzo,* 172 F.3d 38, 1998 WL 964199, at *2 (2d Cir.1998) (table) (citing 18 U.S.C. § 1961(1)(B), (C)).

■ To establish embezzlement, a plaintiff must show that a defendant embezzled, stole or converted funds from an ERISA benefit plan for "his own use or to the use of another." 18 U.S.C. § 664. A plaintiff must also establish that a defendant "was aware that he was receiving money to which he was not entitled and knowing that, deliberately appropriated the money to his own use." *United States v. Snyder,* 668 F.2d 686, 690 (2d Cir.1982) (internal quotation marks and citations omitted).

■ Summary judgment dismissing a RICO claim predicated on embezzlement from an ERISA plan should be granted when the evidence in the record shows that no assets where embezzled from the ERISA plan. *See Red Ball Interior Demolition Corp. v. Palmadessa,* 908 F.Supp. 1226, 1240–41 (S.D.N.Y.1995).

### B.

This is an unusual case. The plaintiffs have conceded that, based solely on the Plan documents in the summary judgment record, there is no money unaccounted for in the Plan. (*See* Oral Arg. Tr. at 20.) The plaintiffs have also conceded that there is no deposition testimony or affidavit in the record from anyone with personal knowledge asserting that there was any money owed to the plaintiffs that was not received by them. (*See* Oral Arg. Tr. at 22 ("THE COURT: [B]eyond speculation, where are the people with personal knowledge who say, okay, this is what the Penn Pension and the Penn Mutual people say happened but it didn't happen that way because we contributed money that's not reflected or it indicates that money was withdrawn and we never received it. There are no such affidavits, right? . . . MS. ROSELL: There are no such affidavits.").)

The plaintiffs' theory of embezzlement in this case rests upon the assertion that the paper documentation provided by the defendants, which the plaintiffs concede indicates that there was no embezzlement, has been falsified. The plaintiffs have acknowledged that, because Penn Mutual has produced original paper copies of the Diversifier I annual statements from 1998 through 2009, there must have been deliberate falsification of the records each year for the last decade. (Oral Arg. Tr. at 21.) The issue is whether there is any evidence in the record to support this version of events.

#### 1.

■ The plaintiffs assert that the documentary evidence in this case is not credible. They seek an adverse inference based on the defendants' failure to produce metadata concerning the plaintiffs' accounts and the Diversifier I, or, in the alternative, based on the defendants' alleged destruction of that data.

■ District courts have "broad discretion" in determining whether to grant an adverse inference. *See, e.g., Glover v. Costco Wholesale Corp.,* 153 Fed.Appx. 774, 776 (2d Cir.2005) (summary order). A party seeking an adverse inference "must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002).

■ An adverse inference would not be warranted here even if the plaintiffs had properly sought one.[1] In this case, the plaintiffs have sought "metadata" which the defendants have asserted cannot be produced in its raw form. Magistrate Judge Katz previously denied the plaintiffs' request for an audit of Penn Mutual's computer systems, Memorandum Endorsement, *Valenti v. Penn Mutual,* No. 10 Civ. 3325, ECF No. 41, and discussed the issue of the metadata with the parties at multiple discovery conferences. *See, e.g.,* Transcript of Conference held on October 13, 2010 ("Oct. 13 Conf. Tr."), *Valenti v. Penn Mutual,* No. 10 Civ. 3325, ECF No. 53; (*see also* Rosell Decl. Ex. 27 (Transcript of Conference held on November 1, 2010)). There is no order from either Judge Katz or this Court the violation of which might support an adverse inference. After lengthy discussion of this issue before Magistrate Judge Katz, there are no pending discovery motions in this case seeking this metadata.[2] The defendants were simply not under any obligation to produce

1. With regard to this and other discovery disputes raised by the plaintiffs in response to the current motion for summary judgment, the plaintiffs may not defeat a motion for summary judgment by arguing that the defendants acted improperly during discovery because the plaintiffs have failed to make any motions to compel the discovery they sought and failed to obtain any sanctions rulings in the course of discovery. *See Bank of America Nat'l Trust & Savings Ass'n v. Envases Venezolanos, S.A.,* 740 F.Supp. 260, 269 (S.D.N.Y.) ("Simple allegations of improper discovery tactics are not sufficient to defeat a summary judgment motion, particularly where the party making those allegations has failed to take advantage of the appropriate avenues of relief available under the Federal Rules of Civil Procedure."), *aff'd sub nom., First Nat. Bank Md. v. Envases Venezolanos,* 923 F.2d 843 (2d Cir.1990) (table).; *accord Dubied Mach. Co. v. Vermont Knitting Co.,* No. 85 Civ. 8610, 1992 WL 142044, at *5 (S.D.N.Y. June 11, 1992) ("This Court has stressed that these mecha-

nisms must be used: a party cannot defeat a summary judgment motion by belatedly asserting that discovery efforts have been frustrated and by vaguely asserting that further discovery may yield unspecified facts that could plausibly defeat summary judgment.").

2. Shortly after oral argument on this motion, the plaintiffs did send a letter to Magistrate Judge Katz requesting that Judge Katz grant an adverse inference in this case. The plaintiffs noted in the letter that while they had not filed a motion for an adverse inference, they had written a letter to Judge Katz over one year ago, in January, 2011, relating to the deposition of an information technology specialist who was familiar with Penn Mutual's computer systems. The January, 2011 letter requested that Judge Katz either impose an adverse inference sanction, or set a date certain for the deposition. There is nothing in the record indicating that any order was issued with respect to this letter, and the defendants argued that they did not respond to it

this metadata.[3]

Moreover, there is no evidence to establish that the defendants failed to produce any documents or data with a culpable state of mind, or to indicate that the defendants were not acting in good faith in those discovery conferences. Indeed, the transcripts from the discovery conferences indicate that the defendants agreed to run additional queries of the raw data in their computer systems in order to satisfy the plaintiffs. *See* Oct. 13 Conf. Tr. at 15–18; (*see also* Mellen Repl. Decl. ¶¶ 9–21.) Moreover, the plaintiffs have not explained what the metadata they seek will show that is different from the documents that have already been produced, and that were, according to Penn Mutual, generated directly from the raw data being sought. (*See* Mellen Repl. Decl. Ex. C) (letter to plaintiffs dated Sept. 24, 2010 explaining that "the information in question is contained in the form of raw data"); Mellen Repl. Decl. Ex. D (email to plaintiffs dated Oct. 1, 2010 explaining that "there is not an individual electronic file corresponding to the [Plan] or to each withdrawal from [it] which occurred over the years; rather, there is an undifferentiated mass of 1's and 0's. Periodically, a process is run on those 1's and 0's to translate them into individual statements and confirmations, like the ones your clients received over the years and we produced in discovery.").

Aside from the issue of the metadata, the plaintiffs have not offered any evidence of the existence of other documents that were requested and not produced, or that were destroyed. Where a plaintiff cannot offer any evidence to indicate that a document ever existed, the plaintiff is not entitled to an adverse inference based on the nonproduction of the document. *See, e.g., Farella v. City of New York*, Nos. 05 Civ. 5711, 05 Civ. 8264, 2007 WL 193867, at *2–*3 (S.D.N.Y. Jan. 25, 2007).

Moreover, an adverse inference alone would not preclude granting summary judgment to the defendants in this case. The Court of Appeals for the Second Circuit has explained that "[i]n borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (internal quotation marks and citations omitted). Even if an adverse infer-

---

because it rehashed discussions that had already been resolved. As explained above, even if this letter constituted a proper request for an adverse inference, an adverse inference would not be appropriate in this case.

3. The plaintiffs also argue that the defendants failed to preserve properly the metadata in question because they did not keep it in a "non-rewriteable and non-erasable" electronic format in violation of S.E.C. regulations. However, those regulations allow backup records to be stored on either "electronic storage media" that "[p]reserve[s] the records exclusively in a non-rewriteable, non-erasable format," 17 C.F.R. § 240.17a–4(f)(2)(ii)(A), or on "micrographic media" such as microfiche, id. at (f)(1)(i). The plaintiffs have not explained how Penn Mutual has failed to comply with this regulation, and the evidence in the record supports the defendants' assertion that Penn Mutual kept contemporaneous hard copies of the annual statements from the Diversifier I. (*See* Oct. 13 Conf. Tr. at 4–5 (noting the storage of required documents on microfiche; Locker Aff. ¶ 4.) In any event, even if Penn Mutual has not complied with those regulations, that non-compliance is not evidence of embezzlement, particularly where, as here contemporaneous records of the accounts show no embezzlement. Moreover, noncompliance with a regulatory duty to preserve records does not justify an adverse inference in the absence of the other requirements for an adverse inference, culpability and relevance. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001).

ence were warranted in this case with regard to the raw data in Penn Mutual's computer systems, which it is not, an adverse inference standing alone may not defeat a motion for summary judgment in the absence of some other, "not insubstantial" evidence of a triable issue of fact. *Id.* No such evidence is in the discovery record in this case.

### 2.

■ The plaintiffs contend that there existed a "secret side account," and that payments to the plaintiffs were made from the secret side account, rather than the Diversifier I, while disbursements from the Diversifier I were embezzled. (*See* Pl.'s R. 56.1 Resp. ¶¶ 34–38.) However, the plaintiffs have offered no evidence that establishes the existence of a secret side account. The plaintiffs point to a number on a check that was received from Penn Mutual that is different from the number on other Penn Mutual checks, and argue that the number signifies a bank account number, and assert that "maybe" this bank account is the secret side account. (Oral Arg Tr. at 23; *see* Rosell Decl. Ex. 46 at 15 (the "736 Check").) The defendants represented at oral argument that the specific number that the plaintiffs refer to on the checks is not even a bank account number, but simply an "internal accounting code." (Oral Arg. Tr. at 7.) A number on a check, without more, is insufficient to establish the existence of a secret side account, let alone that such an account was used as part of a scheme to embezzle from the Plan. The plaintiffs' additional argument, that the lack of disbursements from an account number 736 as reflected in reports run by Penn Mutual is evidence that disbursements were made from a secret side account and not from the Diversifier I, must fail because, among other reasons, there is no evidence in the record

that the 736 number even refers to a bank account.

The plaintiffs also argue that Penn Mutual's investment strategy for the Diversifier I made no sense, because Penn Mutual made riskier investments when the market was doing poorly, and more conservative investments when the market was doing well. The plaintiffs argue that a jury could find that Penn Mutual's investment strategy does not make sense "unless it was fabricating the transfers to conceal its embezzlement of the funds' investment earnings." (Pl.'s R. 56.1 Resp. ¶ 23.) Even if the plaintiffs were correct that Penn Mutual's investment strategy was a bad one, that fact does not create a triable issue as to whether the strategy was fabricated in order to conceal embezzlement.

In short, the plaintiffs have conceded that the documents in the discovery record indicate that no money is unaccounted for in their accounts, and they have failed to produce any evidence that the documents in the discovery record have been fabricated. They speculate about the existence of a secret account but have produced not a scintilla of evidence to support the existence of such an account. Courts in this Circuit "do not permit an issue to go to trial on the basis of mere speculation in favor of the party that bears the burden of proof." *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 144 (2d Cir. 1999). The plaintiffs have failed to meet their burden by producing evidence of embezzlement in this case.

■ A RICO conspiracy claim will not lie when a plaintiff cannot establish the predicate act. *See, e.g., Red Ball*, 908 F.Supp. at 1240–41. Because there is no evidence in the summary judgment record from which a reasonable jury could find that the defendants embezzled from the Plan, the defendants' motion for summary

judgment on the plaintiffs' RICO claim must be **granted.**

### CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit.

The defendants' motion for summary judgment is **granted.**

**The Clerk is directed to enter judgment, to close this case and to close all pending motions.**

**SO ORDERED.**