**CITY OF NEW YORK, Plaintiff,**

v.

**Israel CHAVEZ, Pam Chavez, Chavez, Inc., Pam Chavez, Inc., Pedro Bello, Charles Wells, John Zavolakis, George Karatzidis, Jack Hirsch, Lion Forst, Claudio Capobianco, John Mahoney Jr., Sarah Worrell, and Timothy Foster, Defendants.[1]**

**No. 11 Civ. 2691 (KBF).**

United States District Court, S.D. New York.

May 13, 2013.

1. The Clerk of the Court is directed to amend the caption of this case to conform with the caption as written in this Order, which reflects which parties remain in this action.

Eric Proshansky, Leonard Matthew Braman, New York City Law Department, New York, NY, for Plaintiff.

Jeffrey Kent Wicker, Reed Wicker PLLC, Louisville, KY, Eli J. Richardson, Joseph Brent Crace, Jr., Bass, Berry & Sims, PLC, Nashville, TN, for Defendants.

*MEMORANDUM DECISION*
*& ORDER*

KATHERINE B. FORREST, District Judge:

The City of New York (the "City") here sues certain online cigarette sellers, those sellers' cigarette suppliers, and several dozen of those sellers' buyers (and downstream sellers), for violations of the Contraband Cigarette Trafficking Act, 18 U.S.C. §§ 2341, *et seq.,* (the "CCTA") and of the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961, *et seq.*, ("RICO"). Now before the Court are (1) the City's motion for summary judgment as against defendants Israel Chavez ("Chavez") and Chavez, Inc. (together the "Israel Chavez Defendants") on the City's First Claim for Relief—the CCTA count; and (2) defendant Charles Wells's motion for summary judgment on the City's Third Claim for Relief—the RICO conspiracy count.[2] For the reasons set forth below, the City's pending motion is GRANTED and Wells's is GRANTED.[3]

The parties and the Court are well versed in the facts involved in this matter, and the Court does not here recite them at length.[4] Instead, the Court refers to those

---

**2.** On April 11, 2013, the Court denied on the record the City's motion for summary judgment as against defendants Pam Chavez ("Pam Chavez") and Pam Chavez, Inc. ("PCI", and together with Pam, the "Pam Chavez Defendants", and collectively with the Israel Chavez Defendants, the "Chavez Defendants") as to the City's CCTA count. (*See* ECF No. 251.) On the same record, the City withdrew its summary judgment motion as to all defendants on its substantive RICO and RICO conspiracy counts, (*See id.; see also* ECF No. 249 at 2.) The upstream cigarette suppliers—which include defendant Wells—are collectively referred to herein as the "Supplier Defendants." The downstream buyers/re-sellers are collectively referred to herein as the "Seller Defendants."

**3.** In opposing the City's motion for summary judgment, the Pam Chavez Defendants argued that the City cannot prove that the actions of the Pam Chavez Defendants were the proximate cause under RICO of any injury to the City. (*See* ECF No. 243 ("Pam Chavez Defs.' Opp'n") at 15–17.) The Israel Chavez Defendants "join[ed] in" that argument. (*See* ECF No. 241 ("Chavez Defs.' Opp'n") at 1.) Wells's papers opposing the City's motion for summary judgment and supporting his own motion for summary judgment do not press this argument. The issue of proximate cause was briefed by the parties at the motion to dismiss stage, and the Court previously held that the City had adequately pleaded that defendants' actions proximately caused the City's injury. (*See* ECF No. 144 at 16.) Because the City's summary judgment motion as to its substantive RICO and RICO conspiracy claims has been voluntarily withdrawn, this issue is not now properly once again before the Court, and the Court therefore does not discuss it in this Order.

**4.** Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record before the Court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir.2010). Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. *Price v. Cushman & Wakefield, Inc.*, 808 F.Supp.2d 670, 685 (S.D.N.Y.2011): *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); *see also Price*, 808 F.Supp.2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial."). In addition, self-serving affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment. *See BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir.1996). Only disputes relating to material facts—*i.e.*, "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

facts in the record on this motion as relevant to the issues discussed below.

## DISCUSSION

### A. THE CCTA CLAIM AGAINST CHAVEZ AND CHAVEZ, INC.

The CCTA provides that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes. ..." 18 U.S.C. § 2342(a). The statute defines "contraband cigarettes" as:

a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes, and which are in the possession of any person ..."

18 U.S.C. § 2341(2).

Thus, a violation of the CCTA requires the following elements: (1) a person must knowingly[5] ship, transport, receive, possess, sell, distribute, or purchase, (2) more than 10,000 cigarettes; (3) that do not bear stamps; (4) under circumstances in which state or local tax law requires that such cigarettes bear stamps. 18 U.S.C. §§ 2341–2342; *see also BB's Corner, Inc.,* 2012 WL 2402624, at *2; *City of New York v. Golden Feather Smoke Shop, Inc.,* 08 CV 3966, 2011 WL 6945758, at *3 (E.D.N.Y. Dec. 30, 2011) ("*Golden Feather III* ").

The Israel Chavez Defendants oppose summary judgment on the City's CCTA count on two grounds: (1) arguing that the cigarettes in question in this case were not "contraband" for CCTA purposes because New York State lacked the constitutional authority to tax them; and (2) arguing that the City has not proven that Israel Chavez himself—and not solely Chavez Inc.—violated the CCTA by knowingly transacting in "contraband cigarettes." (*See* ECF No. 241 ("Chavez Defs.' Opp'n") at 1, 4; ECF No. 243 ("Pam Chavez Defs.' Opp'n") at 7–12.)[6]

### 1. The Cigarettes Sold were "Contraband Cigarettes"

█ The argument that the cigarettes at issue are not "contraband" because the City lacks the power to tax them fails for essentially the same reasons as articulated by the Court in its ruling on defendants' motions to dismiss. All cigarettes located in New York State are "presumed taxable"—and are subject to State cigarette taxes—unless the entity challenging the tax affirmatively establishes that the State is "without power" to tax the cigarettes specifically at issue in a given case. *City of New York v. Milhelm Attea & Bros., Inc.,* 06 CV 3620, 2012 WL 3579568, at *1

---

248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

5. In the context of the CCTA, "knowingly" requires that defendants "knew ... what they were selling [or transporting, or distributing, etc]." *State of New York v. BB's Corner, Inc.,*

12 Civ. 1828, 2012 WL 2402624, at *2 (S.D.N.Y. June 25, 2012).

6. On these issues, the Israel Chavez Defendants' papers discuss only the latter argument: that Chavez, Inc., and not Chavez personally, violated the CCTA. (*See* Chavez Defs.' Opp'n at 4–6.) Those papers also "join in" the opposition papers filed by the Pam Chavez Defendants, which discuss the constitutional issue. (*See id.* at 1; Pam Chavez Defs.' Opp'n at 7–12.).

(E.D.N.Y. Aug. 17, 2012) (citing N.Y. Tax L. § 471; *Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc.,* 512 U.S. 61, 64, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994)). The State sells tax stamps to the original upstream distributor of cigarettes, who then affixes those stamps to cigarettes and passes the cost of the tax and stamps on to wholesalers (who pass that cost to retailers and consumers) by accordingly increasing the price of the cigarettes sold. *Id.* at *2 (citing N.Y. Tax L. §§ 471(2), 472(2); *Dep't of Taxation,* 512 U.S. at 75, 114 S.Ct. 2028; *N.Y. Ass'n of Convenience Stores v. Urbach,* 92 N.Y.2d 204, 677 N.Y.S.2d 280, 699 N.E.2d 904, 906 (1998)); *see also Golden Feather III,* 2011 WL 6945758, at *1 ("The tax burden is built into the cost of the cigarettes and passed along the distribution chain to each subsequent purchaser, ultimately falling on the consumer."). The system is designed "to prevent the widespread evasion of New York cigarette taxes." *Milhelm Attea,* 2012 WL 3579568, at *2. In addition to the State's cigarette taxes, the City also imposes its own cigarette tax. *See* N.Y. City Admin. Code § 11–1302.

 Cigarettes sold by sellers residing and operating outside the boundaries of New York State to individuals within the boundaries of the State are subject to New York State's cigarette taxing power. *See Milhelm Attea,* 2012 WL 3579568, at *31 (CCTA violation exists when "[c]ross-border deliveries ... of cigarette shipments from low-tax states ... to high tax states ... [if] the cigarettes are not affixed with the tax stamp of the jurisdiction in which the cigarettes are *found*") (emphasis added); *City of New York v. Golden Feather Smoke Shop, Inc.,* 08 CV 3966, 2009 WL 705815, at *2, *11 (E.D.N.Y. Mar. 16, 2009) ("*Golden Feather I*") (cigarettes sold within sovereign Native American reservation within New York State to non-Native Americans, who then transport the cigarettes into New York where they are found, are subject to State taxes). These are exactly the sales at issue in this case—unstamped cigarettes sold to individuals in New York, or who then transported the cigarettes into New York. The cigarettes were found in New York without tax stamps. They are therefore "contraband." 18 U.S.C. § 2341(2).

As the Court previously explained:

the cigarettes at issue here would qualify as contraband if sold and shipped (or otherwise transported) to non-stamping entities [*i.e.,* the Seller Defendants] in New York because, by virtue of such sale and shipment, unstamped cigarettes come to be "found" in a jurisdiction (New York City) that requires a stamp on the cigarettes indicating that taxes have been paid.... [T]o establish liability, the [CCTA] does not require that the cigarettes sold, shipped, or transported be contraband *at the time* of the sale, shipment, or transport. Rather, it suffices that the cigarettes become contraband *as a result* of the sale and shipment. To interpret the statute otherwise would, effectively, limit liability to the possession of contraband cigarettes, which Congress did not intend.

(ECF No. 144 at 8 (emphasis in original).)

Indeed, it is more than simply that liability would be limited to the mere "possession" of contraband cigarettes—which is a result at odds both with the taxation scheme which seeks to avoid tax evasion in sales, and also with the "most basic [of] interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States,* 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) (internal quotation marks omitted).

The Chavez Defendants' interpretation would effectively render the CCTA a nugatory. The Chavez Defendants essentially argue that the CCTA is not effective at reaching cross-border transactions into New York State—transactions in which out-of-state cigarette sellers "earn" revenues out-of-state through cross-border cigarette sales—because New York State cannot tax the product of cross-border transactions. But if the CCTA were *not* effective at reaching cross-border transactions, then the CCTA could only ever effectively reach wholly in-state violations—sales in which in-state sellers were required to affix tax stamps but failed to do so. But of course, if that were the case, the CCTA would be violative of the Constitution's Commerce Clause because it could ever only reach intra-, and not inter-, state commerce. That is an unsupportable conclusion.[7] Whether or not cigarettes are "contraband" for purposes of the CCTA does not turn on whether the state attempting to tax them where they were ultimately found had the power to tax them where they originated—it turns on whether the cigarettes were stamped with the tax stamp of the place where ultimately found. It is undisputed that the cigarettes at issue in this action lacked New York State tax stamps and were found in New York. They are therefore "contraband cigarettes" for CCTA purposes.

Perhaps recognizing the correctness of those principles, and also the caselaw standing for the proposition that New York State does have the power to tax cigarettes within its borders that are the product of cross-border transactions, the Chavez Defendants' argument takes a slightly different tack. The thrust of the argument is that, as internet sellers without physical presence in New York, their sales lack the constitutionally-required "nexus" to New York State for that State to exercise its taxation power. (*See* Pam Chavez Defs.' Opp'n at 8–10.) Without that "nexus," the argument goes, the cigarettes sold by defendants—over the internet to New York residents—could not be taxed as a constitutional matter and therefore could not be contraband for purposes of the CCTA.

It is telling that the amount of cases dealing with cross-border cigarette smuggling and tax evasion is enormous, yet the Chavez Defendants fail to point the Court to a single one reaching the conclusion they advance on this motion (nor did the Court's own research unearth one). Regardless, the argument fails for several reasons in addition to having no support in the caselaw. First, "contraband cigarettes" for CCTA purposes are 10,000 or more cigarettes found in a jurisdiction that requires them to be marked with tax stamps, and found lacking those tax stamps. *See* 18 U.S.C. § 2341(2). Cigarettes sold to New Yorkers in New York must be stamped—and the cigarettes in question in this case were not. Whether a "nexus" exists between the Israel Chavez Defendants' internet business and New York is simply irrelevant to this analysis.

---

7. And moreover, the CCTA would only ever make *possession* of contraband cigarettes unlawful. Sales or transport *into* the jurisdiction would not be covered because—so argue defendants—the jurisdiction lacks authority to tax until cigarettes arrive in the jurisdiction, and the CCTA covers only taxable cigarettes. Sales or transport *out of* the jurisdiction would not be covered, because the cigarettes themselves would then not be present—found—in the jurisdiction. But the CCTA makes not only possession, but also shipment, transportation, receipt, sale, distribution, and purchase unlawful. The Court will not, indeed cannot, read out that language. *See Lutwin v. Thompson*, 361 F.3d 146, 157 (2d Cir. 2004) ("Where possible, we avoid construing a statute so as to render a provision mere surplusage.").

Indeed, the whole issue of "nexus" is irrelevant. "Nexus" refers to a constitutional requirement for a *foreign* jurisdiction to tax local property or transactions. *See Polar Tankers, Inc. v. City of Valdez, Alaska*, 557 U.S. 1, 11, 129 S.Ct. 2277, 174 L.Ed.2d 1 (2009). But the property the City desired to tax here—and from which tax revenues were denied due to defendants' conduct—was property (the cigarettes) *within* the jurisdiction of the taxing entity (New York). And in any event, the "nexus" here in fact does exist. The argument that the sale of close to 500,000 cartons of cigarettes worth over $130 million into New York does not represent a "significant commercial connection" with the State does not pass the smell test. *Cf. Mayor & City Council of Baltimore v. Vonage Am. Inc.*, 569 F.Supp.2d 535, 539 (D.Md.2008).[8]

For all these reasons, the City has established that the cigarettes sold by the Israel Chavez Defendants were "contraband cigarettes" for purposes of the CCTA.

### 2. Israel Chavez is Personally Liable under the CCTA

The Court also rejects the Israel Chavez Defendants' argument that the City has not established Israel Chavez's personal liability under the CCTA. The Israel Chavez Defendants admit that Chavez, Inc. violated the CCTA. (*See* Israel Chavez Defs.' Opp'n at 4–5 ("it was Chavez, Inc., not Mr. Chavez personally" that violated the CCTA); ECF No. 209 ("Proshansky Decl") Ex. 5 ("Chavez, Inc. Request for Admission Resp.") ¶ 21 (admitting that Chavez, Inc. sent unstamped cigarettes to New York through the mail).)[9] The CCTA authorizes lawsuits for injunctive and other relief—including damages—both against "any person" violating the statute, and against "any person controlling such person" violating the statute. 18 U.S.C. §§ 2346(b)(1), (2). For the purposes of federal regulation over fraudulent or unlawful corporate activities, a person "controlling" a corporate entity is a person with the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of [that entity], whether through the ownership of

8. The Chavez Defendants rely heavily on language from the Appellate Division, First Department's opinion in *Amazon.com, LLC v. N.Y. State Dep't of Taxation & Fin.*, 81 A.D.3d 183, 913 N.Y.S.2d 129 (1st Dep't 2010), which has recently been affirmed (under different caption) by the Court of Appeals. *Overstock.com, Inc. v. N.Y. State Dep't of Taxation & Fin.*, 20 N.Y.3d 586, 965 N.Y.S.2d 61, 987 N.E.2d 621 (2013). In that case, plaintiff online retailers challenged a New York tax code amendment subjecting online retailers to New York sales taxes. The First Department held—and the Court of Appeals affirmed—that those retailers could properly and constitutionally be subject to New York sales taxes because, *inter alia*, through affiliation with unrelated local vendors, the online retailers had effectively "established an in-state sales force." 965 N.Y.S.2d 61, 987 N.E.2d at 626. The case's holding is contrary to the Chavez Defendants' position. Moreover, the Chavez Defendants *were* using a select group of New

York resident Seller Defendants specifically to distribute their cigarettes in New York—effectively "an in-state sales force." This action is entirely within the factual boundaries of what the New York Court of Appeals found permissibly taxable under the United States Constitution in *Overstock.com*.

9. *See also* Response of [the Israel Chavez Defendants] to Plaintiffs Rule 56.1 Statement ("Israel Chavez Defs.' 56.1 Resp.") (ECF No. 244) at 1–2 ("It was [Chavez, Inc.]—not the [Pam Chavez Defendants] or Mr. Chavez—that 'shipped, delivered, sold, and distributed' cigarettes. To the extent the City alleged the [Pam Chavez Defendants] or Mr. Chavez took these actions, it is a disputed fact."); *id.* at 2 ("Chavez, Inc. admits that it ... 'shipped, delivered, sold, and distributed' cigarettes through the Internet, phone, and mail orders."); *id.* at 6 (same); *id.* at 7 (same).

voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.[10] This principle exists so that one cannot avoid the consequences of federal law by acting through otherwise legitimate and valid business organizations.

■ Here, Israel Chavez *admits* that he "managed the affairs of" Chavez, Inc. (Israel Chavez Defs.' 56.1 Resp. at 8.) He admits he was the president, sole shareholder, and sole owner of Chavez, Inc. (Proshansky Decl. Ex. 4 ("Israel Chavez Written Dep. Resp.") ¶¶ 2, 3, 9, 10.) He knew that Chavez, Inc. was selling unstamped cigarettes to customers outside of Kentucky via the internet and other means. (*Id.* ¶¶ 21–23.) Moreover, Chavez, Inc.—which is represented by the same counsel as Israel Chavez, and which filed papers with Israel Chavez—admits that Chavez, Inc. was owned, operated, and managed by Israel Chavez, its sole shareholder. (Chavez, Inc. Request for Admission Resp. ¶¶ 8–11.) Indeed, documented board minutes for Chavez, Inc. indicate that the only person present for the company's 2006 annual meeting was its "sole director ... ISRAEL CHAVEZ," who at that meeting elected himself chairman and president of the company and secretary of the meeting. (Proshansky Decl. Ex. 9 at Bates NYC 1115–16.)[11] Moreover, CD2U's[12] customer invoices all

included a note from "ISRAEL" concerning extra charges on large orders. (*See id.* at Bates NYC 839–848.) In other words, there is no triable issue of fact that Israel Chavez not only knew about and carried out Chavez, Inc.'s business, but that he was *in control* of Chavez, Inc.

Accordingly, the City is entitled to summary judgment against Israel Chavez and Chavez, Inc. on its CCTA claim.

## B. THE RICO CONSPIRACY CLAIM AGAINST WELLS

■ A substantive civil RICO claim under 18 U.S.C. § 1962(c) requires that plaintiff prove that defendant (1) through the commission of two or more acts constituting a "pattern"; (2) of "racketeering activity"; (3) directly or indirectly participated in an "enterprise"; (4) the activities of which affected interstate or foreign commerce; and (5) caused injury to plaintiff. *Valenti v. Penn Mutual Life Ins. Co.*, 850 F.Supp.2d 445, 450 (S.D.N.Y.2012); *see Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013).

■ To establish a *conspiracy* to violate the civil RICO statute pursuant to 18 U.S.C. § 1962(d)—which is what Wells argues here the City cannot do[13]—plaintiff

---

**10.** 17 C.F.R. § 230.405 collectively defines, *inter alia*, the terms "control," "controlling," "controlled by," and "under common control with," for purposes of the federal securities laws. No definition of "control" is written into the CCTA. And no court has explicitly considered the meaning of "person controlling such person" in the CCTA context. Absent such guidance, the same term used in federal statutes should be given common meaning. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005).

**11.** Israel Chavez signed the board minutes twice—first as secretary and second as chair-

man. (Proshansky Decl. Ex. 9 at Bates NYC 1116.) No one else signed the minutes. Similarly, the board minutes for the company's January 2005 meeting indicate that Israel Chavez, the company's sole director and the chair and secretary of the meeting, was the meeting's only attendant. (*Id.* at Bates NYC 1099–100.)

**12.** Chavez, Inc. was doing business as "CD2U." (Chavez, Inc. Request for Admission Resp. ¶ 4.)

**13.** This portion of this Order deals with Wells's motion for summary judgment against the City on the City's civil RICO conspiracy

must prove (1) that there existed a conspiracy to commit acts that, if successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner (although not necessarily by the commission of any RICO predicate acts himself). *Valenti,* 850 F.Supp.2d at 450–51; *see also United States v. Pizzonia,* 577 F.3d 455, 463–64 (2d Cir.2009) (RICO conspiracy is "an agreement to conduct or to participate in the conduct of a charged enterprise's affairs"); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990).

Wells argues, *inter alia,* that the "association-in-fact" provable by the City on the record on the pending motions cannot constitute a RICO "enterprise" as a matter of law.[14] Thus, argues Wells, there cannot have been any conspiracy to violate RICO because the underlying acts, if successful, · would not have constituted a substantive RICO violation. If that is the case, the argument goes, then there is no genuine dispute of fact requiring a trial, and the City cannot prove a RICO conspiracy claim against Wells. As set forth below, the Court agrees.

### 1. RICO Enterprises, "Hubs," and "Spokes"

■ "RICO makes it 'unlawful for any person employed by or *associated with any enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....'" *Boyle v. United States,* 556 U.S. 938, 943–44, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009) (quoting 18 U.S.C. § 1962(c)) (emphasis in original). The "enterprise" requirement may be satisfied by proving that the alleged association is one including individuals—or corporate, legal, or business entities, unions, or groups—"associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This concept "has a wide reach"; accordingly it is to be "liberally construed to effectuate [RICO's] remedial purposes," and is not exhaustive but instead "might include, in addition to the specifically enumerated entities, others that fall within the ordinary meaning of the term 'enterprise.'" *Boyle,* 556 U.S. at 944 & n. 2, 129 S.Ct. 2237.

■ An "association-in-fact" for RICO purposes "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 945, 129 S.Ct. 2237. It must have "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946, 129 S.Ct. 2237. In other words, it is "succinctly ... a group of persons associated together for a common purpose of engaging in a course

---

claim against Wells. Thus the burden is on Wells to show the absence of a triable issue of fact on the City's claim. The Court draws all reasonable inferences in favor of the non-movant City. The City's burden is one of production, not persuasion. To survive summary judgment, the City must produce facts which raise a triable issue upon which a civil RICO conspiracy judgment could be based.

14. Wells also argues that there is no genuine dispute of fact that the various actors ever agreed to violate RICO's substantive provisions—*i.e.,* that there was no conspiracy in the first place—and that there is no genuine dispute of fact that Wells ever knowingly consented to join in that conspiracy. Because the Court here finds that the association provable by the City on the current record cannot constitute a RICO "enterprise," the Court does not reach these arguments.

of conduct." *Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)); *see also id.* at 948, 129 S.Ct. 2237 ("an association-in-fact enterprise is simply a continuing unit that functions with a common purpose"). Furthermore, its associates must not operate entirely "independently and without coordination"—instead, the enterprise must have some existence beyond the commission of the individual racketeering violations alone. *Id.* at 947 & n. 4, 129 S.Ct. 2237; *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F.Supp.2d 300, 309 (S.D.N.Y.2009) (RICO enterprise must be "separate and apart from the pattern of activity in which it engages").[15]

▮▮ At the same time, the Supreme Court has made explicit that the enterprise need not have any formal structure, nor any hierarchy, role differentiation, modus operandi, chain of command, professionalism, sophistication, diversity, complexity, membership attributes, internal discipline mechanisms, meetings, ceremonies, or rituals. *Boyle*, 556 U.S. at 948, 129 S.Ct. 2237. Nor must the enterprise engage in any conduct violating RICO other than the individual racketeering violations, so long as the enterprise has some form of existence beyond merely the commission of those violations. *Id.* at 948, 951, 129 S.Ct. 2237. Thus, an "association-in-fact is oftentimes more readily proven by what is does, rather than by abstract analysis of its structure." *Id.* at 951, 129 S.Ct. 2237. Indeed, mindful that the enterprise must also have some element of existence

beyond the predicate acts committed, "proof of a pattern of racketeering activity may be sufficient in a particular case to permit [the factfinder] to infer the existence of an association-in-fact enterprise." *Id.*; *see also United States v. Applins*, 637 F.3d 59, 73 (2d Cir.2011) ("proof of various racketeering acts may be relied upon to establish the existence of the charged enterprise"); *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 368 n. 64 (3d Cir.2010) (*Boyle* "held that an association-in-fact enterprise need not *do* anything other than engage in the pattern of racketeering activity, so long as it has the requisite structural features (common purpose, interrelationships among its associates, and longevity).") (emphasis in original).

Because the Supreme Court's decision on the "enterprise" question in *Boyle* is so recent, and because the "enterprise" question is so key to this action, the Court here discusses the legal aspects of this issue in some depth:

In *Boyle*, the Supreme Court was asked to review the appropriateness of jury instructions regarding the existence of a RICO "association-in-fact" enterprise in a criminal case. The defendants in that case were a "core group" of bank robbers, who recruited additional members for several dozen thefts "from time to time." *Boyle*, 556 U.S. at 941, 129 S.Ct. 2237. The "loosely and informally organized" group had no leader, hierarchy, long-term plan, or general agreement. *Id.* The issue

---

**15.** *See also In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 365 (3d Cir.2010) ("The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. ... [I]t is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses.").

in the case was not whether the evidence could have proven the existence of an "enterprise," but was instead whether the trial court's jury instruction concerning "enterprise" was appropriate. The trial court instructed the jury that the existence of an "enterprise" required the jury to find that there was "an ongoing organization with some sort of framework, formal or informal, for carrying out its objectives"; that "the various members and associates of the association functioned as a continuing unit to achieve a common purpose"; and that the organization's members "functioned and operated in a coordinated manner in order to carry out the alleged common purpose or purposes of the enterprise," *Id.* at 942 and n. 1, 129 S.Ct. 2237 (alterations omitted).

The question before the Court was whether the trial court erred by not stating a proposed instruction that the enterprise have "an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages." *Id.* at 945, 129 S.Ct. 2237. The Court held that that proposed requirement need not be explicit. First, the word "ascertainable" was unnecessary because the jury was already instructed that it must "find" the existence of the various relevant elements beyond a reasonable doubt. *Id.* at 947, 129 S.Ct. 2237. Second, the phrase "beyond that inherent in the pattern of racketeering activity in which it engages" was potentially misleading because the phrase might wrongfully confuse the jury into believing that the evidence upon which the jury relied to find the existence of the underlying predicate offenses *could not* also be relied upon to find the existence of the enterprise itself. *Id.*

Third—and most importantly for this action—the concept of "structure" was already contained in the jury instruction's

references to, *inter alia*, an "*ongoing organization*," a framework for "carrying out [the organization's] objectives," the "function[ing] as a continuing unit to *achieve a common purpose*," and the "function[ing] and operat[ing] in a *coordinated manner* in order to carry out the alleged *common purpose*." *Id.* at 946, 129 S.Ct. 2237; *see also id.* at 942 n. 1, 129 S.Ct. 2237 (all emphases added). Thus the instruction was sufficient to explain to the jury that the association-in-fact must have a structure containing "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.... [*I.e.*,] a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 946, 129 S.Ct. 2237.

The thrust of Wells's argument is that the record in this case fails to raise a genuine dispute of fact as to the concept of the enterprise's "structure." He relies on a series of cases in which courts found that no "association-in-fact" enterprise existed, as a matter of law, when the evidence proved separate and parallel vertical, bilateral relationships between one central actor and several independent actors one level removed from the central actor in the scheme. Such an organization is known as a "hub and spokes" association. Thus, argues Wells, no RICO enterprise can exist here because the relationships between the Chavez Defendants—the purported "hub"—and each of the Supplier Defendants, including Wells—the purported "spokes"—were separate, uncoordinated, and entirely independent. In other words, the relationships within the structure provable by the City required no, and as a matter of fact lacked any, ongoing organization, coordination of any kind, dependence, or common purpose.

The insufficiency of "hub-and-spokes" associations to constitute RICO "enterprises" has been long recognized. Thus in *First Nationwide Bank v. Gelt Funding, Corp.,* Judge Mukasey of this Court ruled that a "classic 'hub-and-spoke' conspiracy" was not a RICO enterprise because plaintiff had not alleged how a mortgage broker (the "hub") and its borrower-clients (the "spokes") "joined together as a group," to defraud the plaintiff bank. 820 F.Supp. 89, 98 (S.D.N.Y.1993). Plaintiff alleged, essentially, that the broker and its borrowers together misrepresented to plaintiff the values of properties securing loans sought from plaintiff, in order to obtain larger loans. *See id.* at 92. Judge Mukasey declined to credit plaintiff's "[c]onclusory allegation[ ]" that "for over six years defendants shared common fraudulent purposes and plans." *Id.* at 98. He instead found that plaintiff had pleaded a "series of discontinuous independent frauds"—"several [spokes] each committed a similar but independent fraud with the aid of a particular [hub], and [ ] each such [spoke] acted on a particular occasion to benefit himself or herself and not to assist any other [spoke]." *Id.,* These independent frauds, the convergence of which was represented solely by a common central, and required, actor, was not an "enterprise" for RICO purposes, *Id.*

Other judges in this Court have reached similar results. In *New York Auto. Ins, Plan v. All Purpose Agency & Brokerage, Inc.,* Judge Duffy ruled that the association of an insurance broker (the "hub") and its insured-clients (the "spokes") was not a RICO enterprise formed to defraud plaintiff insurance company. 97 Civ. 3164; 1998 WL 695869, at *1, *5–6 (Oct. 6, 1998). Judge Duffy ruled that the "fraudulent insurance applications [ ] submitted ... through one insurance broker. ... on behalf on numerous unrelated insureds ... is a classic 'hub and spoke' conspiracy," not

constituting a RICO enterprise. *Id.* at *5. Said the Court:

> Clearly, the Insureds did not join together as a group to perpetuate the frauds against the Plaintiffs. Rather, it appears that the Insureds each committed similar but independent frauds with the aid of the [broker], and that each Insured acted on a particular occasion to benefit himself or herself and not to benefit any other insured.

*Id.* at *6.

More recently, Judge Kaplan held that a Bruneian prince's legal advisors, and certain entities they controlled, were not a RICO enterprise designed to defraud the Bruneian price through, *inter alia,* certain fraudulent real estate and other corporate transactions, employment arrangements, and improper asset management activities. *Cedar Swamp Holdings, Inc. v. Zaman,* 487 F.Supp.2d 444, 446–47, 451–52 (S.D.N.Y.2007). Judge Kaplan noted that a "hub-and spokes" association *can* be a RICO enterprise; but that to be such there must be allegations or evidence of "each defendant's necessary and symbiotic contribution to the overall scheme." *Id.* at 451.. Thus,

> an allegation that the perpetrator of a series of independent fraudulent transactions used a different accomplice to aid each transaction is insufficient to justify a conclusion that the perpetrator and the accomplices together constituted an ongoing organization or functioned as a continuing unit. To satisfy the enterprise element of a RICO claim, a plaintiff must allege that the *defendants operated symbiotically and played necessary roles in the achievement of a common purpose.*

*Id.* (emphasis added). But in the *Cedar Swamp* case, the "complaint simply group[ed] together all of the individuals

and entities involved in the racketeering acts and call[ed] them an enterprise." *Id.* There were no allegations that any alleged conspirator acted for the benefit of another conspirator, that any had relationships with one another, or that their actions were anything except "isolated and independent." *Id.* at 451–52. Judge Kaplan furthermore rejected the argument that each isolated fraud was in fact an implementing part of a larger "master scheme"—even if that were the case, there were no factual allegations connecting the isolated parts to one another: none relied on any other scheme, nor were any necessary for achievement of the overall purpose of fraud. *Id.* at 451. There was simply "no indication that this group was an 'ongoing organization' as opposed to an *ad hoc* collection of entities and individuals who each happened to have been involved in one scheme or another" against the Bruneian prince. *Id.*

Furthermore, judges in this District continue to find classic "hub-and-spokes" structures insufficient for RICO enterprise purposes even in the wake of *Boyle's* directive to interpret the requirement liberally and expansively. In *Elsevier Inc. v. W.H.P.R., Inc.,* Judge McMahon, held that certain individuals running a subscription agency for scholarly periodicals—essentially subscription brokers—were not a RICO enterprise designed to defraud plaintiff publishing company by pretending their clients were entitled to lower-rate journal subscriptions. 692 F.Supp.2d 297, 301–02, 306–07 (S.D.N.Y.2010). Judge McMahon thoroughly discussed Boyle, and noted that "no additional relationship [among the individuals involved other than their participation in the affairs of the association] is necessary, as long as facts are alleged [that there is] something more than parallel conduct of the same nature and in the same time frame by different actors in different locations." *Id.* at 306–07. How-

ever, Judge McMahon found that "not a single fact is pleaded tending to show that the various sets of named defendants ... had any interpersonal relationships.... Nothing in the Complaint explains how these particular people, located in different parts of the country, came to an agreement to act together." *Id.* at 307. She concluded:

> In this post-[*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)] era, I conclude that a plaintiff must allege something more than the fact that individuals were all engaged in the same type of illicit conduct during the same period.... Given the exceptional seriousness of racketeering allegations, a complaint pleading a RICO violation cannot be held to a lesser standard.

*Id.*

The Second Circuit has not addressed the vitality (or lack thereof) of "hub-and-spokes" associations in the wake of *Boyle.* But the Third Circuit has, and has determined that, as in pre-*Boyle* times, classic "hub-and-spokes" associations cannot constitute RICO enterprises. In *In re Insurance Brokerage Antitrust Litigation,* that court found that schemes in which insurance brokerage firms colluded with insurance providers to steer clients towards particular insurers for certain commission fees did not constitute RICO enterprises. 618 F.3d 300, 311–12, 374–76 (3d Cir.2010). Plaintiff insureds had alleged several bilateral—and often overlapping—relationships between one of several insurance providers and one of several insurance brokers. *Id.* at 374. But plaintiffs "failed to plead facts plausibly suggesting collaboration among the [insurance *providers* ]." *Id.* It was true that each insurance provider (each "spoke") had deals with each broker (each "hub"); that each provider knew the identity of the other providers with whom each

broker dealt, and knew the details of those arrangements; and that each arrangement essentially contained equivalent fraudulent terms. *Id.* But "these allegations [did] not plausibly imply concerted action—as opposed to merely parallel conduct." *Id.* Thus the allegations "fail[ed] the basic requirement [of *Boyle* ] that the components function as a unit." *Id.*

The *Insurance Brokerage* court reached a different result, however, in considering a separate alleged "hub-and-spoke" enterprise involving bid rigging among the brokers and the insurance providers. This scheme allegedly required the insurance providers (the "spokes") to collaborate amongst themselves and submit pre-planned sham bids, through a broker, to companies seeking insurance coverage in order to obtain better prices for all of the providers collectively. *Id.* at 375–76. Because this scheme involved "an expectation of reciprocity and cooperation among the insurers," it satisfied *Boyle's* structure requirements and was a validly pleaded RICO enterprise. *Id.*

It is also the case that some judges have declined to hold plaintiffs to stricter standards when it comes to pleading "hubs" and "spokes" post-*Boyle*. Thus in *Fuji Photo Film U.S.A., Inc. v. McNulty,* Judge Scheindlin denied a motion to dismiss a RICO claim in a case that, at least as written, can only be described as a classic "hub-and-spokes" association. 640 F.Supp.2d 300, 306–08, 314 (S.D.N.Y.2009) ("*Fuji I* "). In that case plaintiff company alleged that its promotional services manager conspired separately and independently with several outside vendors so that the vendors would pay bribes to the manager to be retained by plaintiff to provide promotional services, and in return the manager would cause plaintiff to overpay for those services or to pay for those services when they were never in fact per-

formed. *Id.* at 307. Judge Scheindlin found that the association alleged "ha[d] a clear structure. [Defendant manager] was the heart of the enterprise and at all relevant times exercised authority and control. . . . [He] retain[ed] a collection of outside vendors, most of which were single-person entities owned and operated by [his] wife and friends." *Id.* at 314.

Although Judge Scheindlin did not explicitly address the "hub-and-spokes" issue in reaching that conclusion, she did in denying a later motion to dismiss on a later, amended complaint:

> [Defendant] renews his argument that [plaintiff's] enterprise allegations are inadequate because they amount to the "rimless hub and spoke["] . . . . Specifically [defendant] asserts that the Amended Complaint fails to plead any facts regarding how the defendants "were connected or interdependent or worked together." [Defendant's] contention is again unavailing. . . . [T]he alleged association-in-fact enterprise possessed a discernible structure. [Defendant manager] occupied the center of the enterprise and used his position within [plaintiff company] to coordinate the activities of the individual and corporate defendants that made up the enterprise's outer edge.

*Fuji Photo Film U.S.A., Inc. v. McNulty,* 05 Civ. 7869, 2009 WL 3334867, at *3 (S.D.N.Y. Oct. 14, 2009) ("*Fuji II* "). Judge Scheindlin explained that the alleged enterprise's success was "attributable to the extensive cooperation among the vendor defendants [the 'spokes']." *Id.* As an example—indeed the only example—Judge Scheindlin noted that a vendor defendant one time billed plaintiff for services done by another vendor defendant, all at the direction of the defendant manager. *Id.* Judge Scheindlin did not address the line of cases summarized *su-*

*pra*—or any others—discussing the "hub-and-spokes" issue. And it is not immediately apparent what relationships existed in *Fuji* that did not in *First Nationwide Bank, All Purpose Agency, Cedar Swamp, Elsevier,* or *Insurance Brokerage Antitrust Litigation.*

With all of this background, the Court is left with the question of what is required to prove the existence of a RICO enterprise specifically in the context of what appears to be a "hub-and-spokes" association. RICO is meant to punish the illegal racketeering activity of *enterprises*—groups of persons acting *together* in *collaborative, concerted, coordinated, and cooperative manners.* Thus, as the cases repeatedly emphasize, the individuals and/or entities a civil plaintiff or criminal prosecutor seeks to paint as an "enterprise" must have "ongoing organization"; the enterprise must "function as a continuing unit"; it must "have a common purpose of engaging in a course of conduct"; its members must be in certain ways "dependent" on one another; its members must be in certain ways "joined together as a group"; its members must act in certain ways "to benefit" one another; its members must contribute to the association's goals and purposes in some "necessary and symbiotic" manner; its members' activities must in some manner "rely" on other members' activities. Contrawise, when all the evidence shows is a series of similar but essentially separate frauds carried out by related entities—when those frauds are independent of one another; can be effective without the perpetration of any of the other frauds proven; provide no benefit or assistance to the perpetration of any of the other frauds proven; and in no way require coordination or collaboration among the actors perpetuating the fraud—then no RICO enterprise exists. The difference can really be boiled down to a simply-stated distinction: If each act of fraud is equally effective without the perpetration of any other act of fraud—even if perhaps effective to a far lesser or different magnitude—then there is no RICO enterprise. If each act of fraud is not effective without the other acts of fraud, then a RICO enterprise exists.

### 2. No Enterprise Involving Wells Exists in this Case

Mindful of the discussion of "hub-and-spokes" cases supra, the Court now turns to the questions (1) whether the City can prove anything more than a classic "hub-and-spokes" association; and (2) if not, whether the City can sustain its RICO conspiracy claim against Wells. The Court answers both questions in the negative.

The record on this motion, construed in the light most favorable for the non-movant City, demonstrates that the most the City can prove at trial is a classic "hub-and-spokes" association.

To be sure, the City has presented significant evidence that Wells was knowingly involved in, and knowingly facilitated, illegal activity in violation of the CCTA and state tax laws. There is evidence that Wells illegally sold cigarettes himself; that Wells facilitated the Chavez Defendants' illegal CCTA-violating sales; that Wells knew some, and perhaps a large, part of the Chavez Defendants' operations—in terms of scope, plans, associates, suppliers, and customers; that Wells knew how his activities and the activities of the Chavez Defendants violated the law, and knew how his activities helped Israel Chavez and Chavez, Inc. violate the law; that Wells knew that the Chavez Defendants associated with other Supplier Defendants to perpetuate similar schemes to the scheme Wells had with the Chavez Defendants; that Wells knew other Supplier Defen-

dants, and knew of those other Supplier Defendants' relationships with the Chavez Defendants; and that Supplier Defendant Pedro Bello in fact introduced Supplier Defendant Joseph Allan Fish to Israel Chavez, and that Bello and Fish transacted with each other, (*See* ECF No. 202 ("Wells MSJ Mem.") at 5–6; Proshansky Decl. Ex. 15 [oral Deposition of Charles Wells, dated Sept. 22, 2011, taken in this action *City of New York v. Chavez, et al.,* 11 Civ. 2691 (S.D.N.Y.) ] ("Wells Dep.") at 25–33, 43, 57–59; ECF No. 224 ("Wells 56.1 Resp.") at 2–3, 10–11, 14–15; Chavez, Inc. Request for Admission Resp. at 9–11; Proshansky Decl. Ex. 12 ("Fish Dep.") at 18, 36–37.) [16]

■ However, there is no evidence, at all, that any of the illegal acts genuinely in dispute in any way required the existence of any other defendant's illegal act in order to be effective in bringing profits to Wells. There is no evidence that Wells acted in a symbiotic manner with any other defendant, including the Chavez Defendants. There is no evidence that Wells collaborated or cooperated with any other Supplier Defendant. There is no evidence that any Supplier Defendant ever had any meeting, discussion, or understanding with any other Supplier Defendant for the purposes of discussing how to, with Israel Chavez, evade cigarette taxes. There is no evidence that the defendants as a whole operated as a continuing unit. There is no evidence that any Supplier Defendant acted to benefit any other Supplier Defendant. There is no evidence that any Supplier Defendant's benefits from the overall scheme relied on, or were dependent on, in any way the participation of any other Supplier Defendant.

Indeed, the evidence proves just the opposite. As the City points out numerous times, Wells testified at his deposition that Israel Chavez requested that Wells invoice him for cigarette sales in a particular fraudulent manner—by submitting false invoices from a separate company—so that Chavez could avoid the taxing authorities. (Wells Dep. at 31–33.) Moreover, Wells testified that Israel ran a parallel unstamped cigarette purchase/sale scheme with Bello; and that that scheme required that the cigarettes in question be unstamped or else Chavez would have had no economic incentive to perpetuate the scheme. (*Id.* at 58–59.) In other words, the success of each of Israel Chavez's schemes depended, apparently, only on the agreement between Israel Chavez and one particular Supplier Defendant to perpetuate each scheme in a particular manner. But those schemes did not depend on the perpetuation of any other scheme or agreement between any Supplier Defendant and Israel Chavez. These schemes

---

**16.** *See also* Wells Dep. at 25–27 (Wells admitting he knew Chavez bought Kentucky-tax-stamped cigarettes from him for resale to customers outside of Kentucky via the internet); *id.* at 29–30 (admitting that he knew Chavez bought unstamped cigarettes from him for resale outside of Kentucky via the internet after Kentucky increased is cigarette (stamping) tax, because continuing to deal in Kentucky-stamped cigarettes would have been uncompetitive); *id.* at 31–33 (admitting that he invoiced Chavez on false letterhead to avoid reporting the sales to Kentucky authorities); *id.* at 38–39 (admitting that he delivered unstamped cigarettes to Chavez for resale outside of Kentucky via the internet); *id.* at 43 (admitting that both Chavez and Pam paid the invoices he sent to the Chavez Defendants); *id.* at 56–59 (admitting, from conversations with Chavez and with defendant Pedro Bello, that he knew Chavez was also being supplied with unstamped cigarettes by Bello); Proshansky Decl. Ex. 21 ("Wells Request for Admission Resp.") ¶¶ 14–18, 33, 35–40 (admitting Wells sold falsely-invoiced cigarettes to Chavez; that during the relevant time period Chavez was Wells's largest customer; that Wells knew Chavez was selling unstamped cigarettes outside of Kentucky via the internet).

were entirely independent of one another, factually connected only due to the "hub" of the Chavez Defendants. Indeed, if anything, the testimony suggests that Wells was *not* necessary for the perpetuation of the overarching scheme—if Wells had, say, refused to submit the fraudulent invoices from the company he was not part of, then Chavez would have simply dropped Wells and continued to work with Bello and the other Supplier Defendants.

The facts that Wells knew of the Chavez Defendants' relationships with the other Supplier Defendants—from both his relationships with the Chavez Defendants and his relationships with other Supplier Defendants like Bello, and knew how the Chavez Defendants' scheme worked—both in terms of how it violated the law and how it created economic advantages—does not supply the evidence necessary to create a genuine dispute of fact requiring a trial on the "enterprise" question. This is precisely the type of evidence—evidence of *knowledge,* not of *symbiotic dependency*—that the courts have continuously found insufficient in similar circumstances. In the *Insurance Brokerage* case, the allegations were even that all parties had equivalent spiderweb relationships with one another, and that all the parties knew of the existence and mechanics of each others' relationships—yet these allegations simply suggested "parallel conduct," not "concerted action." 618 F.3d at 374. And this Court in *All Purpose Agency* dismissed the complaint where, as here, "[c]learly, the [associates] did not join together as a group to perpetuate the frauds ... [but instead] each committed similar but independent frauds with the aid of" the central "hub" entity. 1998 WL 695869, at *6. There is no allegation in this case of any symbiosis, of any meeting of the minds among the various actors acting as a single unit, or of any reliance of any Supplier Defendant-level actor on any other such actor, or of any benefit conferred among the Supplier Defendants.

"Given the exceptional seriousness" of RICO, "plaintiff must [prove] something more than the fact that individuals were all engaged in the same type of illicit conduct during the same period." *Elsevier,* 692 F.Supp.2d at 307. Yet this is all the City can prove in this case. All the City can prove is the profit-maximizing, fraudulent, and potentially illegal actions of several individuals essentially acting independently of one another, although all acting centrally through Israel Chavez.[17]

---

**17.** Wells argues that certain parts of the City's record on these motions—to wit, the Affidavit of Special Agent John M. Black of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") (the "Black Affidavit") (Proshansky Decl. Ex. 2), and an unproduced "Data File" created by the ATF and referred to in a letter produced in discovery in this case (*see* ECF No. 204 ("Richardson Decl.") Ex. 17, at Bates NYC–192–NYC–194)—are inadmissible or otherwise improperly before the Court, and that the Court therefore cannot consider them. (Wells MSJ Mem. at 6–11.) As the Court stated on the record on April 11, 2013, the Court would not consider the Black Affidavit or the Data File in disposing of the motions before the Court on this Order—and the Court has not done so herein. However, even if the Court had considered that material—specifically, the Black Affidavit—the Court's conclusion would not change. The Black Affidavit, if considered on this motion, would simply buttress much of the City's otherwise-proffered evidence. It shows that Wells supplied the Chavez Defendants with deliveries of cigarettes in the fraudulent and perhaps illegal manner described *supra.* (Black Affidavit ¶¶ 29, 34, 37, 43, 44, 53.) It shows that Wells knew the mechanics of the Chavez Defendants' scheme. (*Id.* ¶ 43.) Indeed, it shows that Wells has been involved in widespread illegal cigarette trafficking, sometimes involving the Chavez Defendants and sometimes independent of the Chavez Defendants. (*Id.* ¶¶ 27, 29.) But it does not show any symbiosis between Wells, any other Supplier Defendant, and the Chavez Defendants.

Under the cases discussing and describing "hub-and-spokes" associations for RICO purposes, the City's proffered evidence in this case can only possibly establish the existence of just that type of association. The City, in other words, cannot raise a triable issue of fact as to whether an enterprise more established than a "hub-and-spokes" association ever existed in this case. This is insufficient to make out a RICO violation as a matter of law. And therefore the acts which are the subject of the conspiracy the City asserts Wells participated in cannot, even if proven, constitute substantive RICO violations. Accordingly, Wells cannot, as a matter of law, be liable for any RICO conspiracy claim, and the Court must dismiss that claim as to Wells. The RICO conspiracy claim being the only claim asserted against Wells in this action,[18] Wells is hereby terminated from this case.

## CONCLUSION

For the reasons stated above, the City's motion for summary judgment against Israel Chavez and Chavez, Inc. on the City's CCTA claim—the First Claim for Relief in the Complaint—is GRANTED; and Wells's motion for summary judgment is GRANTED, and Wells is terminated from this action.

Pursuant to Federal Rule of Civil Procedure 56(f), the Court may, "[a]fter giving notice and a reasonable time to respond ... grant summary judgment for a nonmovant ... [or] consider summary judg-

ment on its own after identifying for the parties material facts that may not be in genuine dispute." Fed. R. Civ. P. 56(f)(1), (3). For the same reasons as discussed at length in granting Wells's summary judgment motion, the Court hereby *gives notice that the Court intends to grant summary judgment in favor of nonmovant Supplier Defendant Pedro Bello.* The facts and circumstances concerning Bello are much the same as those concerning Wells. The City has presented evidence—serious in quantity and quality—that Bello agreed to engage in widespread illegal cigarette sales. The City has not, however, presented evidence that Bello agreed to engage in activity that would violate RICO's substantive provisions—the association in which Bello engaged in that activity is not cognizable as an enterprise for RICO purposes.

**Accordingly, the Court intends to *sua sponte* grant summary judgment for Bello on the City's RICO conspiracy claim on the thirtieth day following the date of this Memorandum Decision & Order, pending consideration of any arguments the City might make within that time frame.**

This result, however, does not apply to the Chavez Defendants on any RICO or RICO conspiracy claim faced by them. As discussed on the record at numerous teleconferences, the parties have been directed to proceed in certain discovery efforts relating to ATF Special Agent Black (dis-

---

Indeed, that Wells was involved in illegal cigarette trafficking without the Chavez Defendants undercuts that very inference—Wells was operating to maximize his own profits; so were the Chavez Defendants; but they were not part of an integrated enterprise.

18. Wells also argues that the City cannot seek an injunction requiring that Wells cease violating the CCTA because the City is not proceeding through its "chief law enforcement

officer." (*See* Wells MSJ Mem. at 29–30.) The City has apparently withdrawn this request for relief as against Wells (*see* ECF No. 219 at 39), and this element of this case is therefore moot. The Court notes, however, that this argument was raised and thoroughly dealt with on defendants' motions to dismiss (*see* ECF No. 144 at 5–6), and that there would be no reason to disturb that holding if it were live.

cussed *supra,* in footnote 17). It is understood by all parties and by the Court that certain information asserted by Black might allow for the existence—and even an eventual victory by the City—as to all of the City's remaining claims against all of the Chavez Defendants. That the vertical, bilateral arrangements between the Chavez Defendants and the Supplier Defendants cannot constitute an "enterprise" for RICO purposes, does not foreclose the possibility that the horizontal association of Israel Chavez and Pam Chavez, and their companies, cannot constitute an "enterprise." Indeed, the Chavez Defendants did not move for summary judgment on any of the City's claims against them, and this question is not even therefore properly before the Court (nor could the Court consider it on this record).

The parties are directed to continue to comply with the scheduling order entered by the Court on April 12, 2013 (ECF No. 250).

The City is directed to serve each *pro se* defendant a copy of this order by priority mail.

The Clerk of the Court is directed to close the motions at ECF Nos. 201 and 205. The Clerk of the Court is directed to further terminate defendant Charles Wells from this action. The Clerk of the Court is further directed to amend this action's caption as indicated in footnote "1" herein.

SO ORDERED.